# In the United States Court of Federal Claims

No. 16-710 C

Filed: February 7, 2017[*]

**********************************************

| | |
|---|---|
| * | |
| SYSTEM DYNAMICS * | 28 U.S.C. § 1491(b) (Bid |
| INTERNATIONAL, INC., * | Protest Jurisdiction); |
| * | 48 C.F.R. 15.305 (Proposal |
| Plaintiff, * | Evaluation); |
| * | 48 C.F.R. 15.306 (Determination |
| v. * | Of Competitive Range); |
| * | 48 C.F.R. 15.404-1(Proposal |
| THE UNITED STATES, * | Analysis Techniques); |
| * | 48 C.F.R. 33.103(d) (Procedures |
| Defendant, * | Governing Agency Protest); |
| * | 48 C.F.R. 52.222-46 (Evaluation |
| and * | Of Compensation For |
| * | Professional Employees); |
| CRUZ ASSOCIATES, INC., * | Rule of the United States Court of |
| * | Federal Claims ("RCFC") |
| Defendant-Intervenor. * | 12(b)(1) (Motion To |
| * | Dismiss For Lack Of |
| * | Subject-Matter |
| * | Jurisdiction). |

**********************************************

**Walter Brad English**, Maynard, Cooper & Gale, P.C., Huntsville, Alabama, Counsel for Plaintiff.

**Amanda L. Tantum**, United States Department of Justice, Civil Division, Washington, D.C., Counsel for the Government.

**Robert Erwin Korrroch**, Williams Mullen, P.C., Newport News, Virginia, Counsel for Defendant-Intervenor.

## MEMORANDUM OPINION AND FINAL ORDER

**BRADEN**, *Judge*.

On June 17, 2016, System Dynamics International, Inc. ("SDI") filed a Complaint in the United States Court of Federal Claims protesting the United States Special Operations Command's

---

[*] On January 31, 2017, the court forwarded a sealed copy of this Memorandum Opinion And Permanent Injunction to the parties to redact any confidential and/or privileged information from the public version and note any citation or editorial errors requiring correction. The parties proposed no redactions.

("the SOCOM") decision to eliminate SDI from the competitive range of Solicitation No. H92241-15-R-0003 ("Solicitation").  To facilitate review of this Memorandum Opinion And Final Order, the court has provided the following outline:

I.   **Relevant Factual Background.**

    A.   **Overview Of Solicitation No. H92241-15-R-003.**

        1.   **The Technical Capability Factor.**

            a.   **Regarding The Management Approach Subfactor.**

            b.   **Regarding The Recruitment, Retention, And Sustainment Of A Qualified Workforce Subfactor.**

            c.   **Regarding The RFTOP Subfactor.**

        2.   **The Price Factor.**

        3.   **The Past Performance Factor.**

    B.   **Objections To The Terms Of Solicitation No. H92241-15-R-0003.**

    C.   **The Source Selection Evaluation Board's May 9, 2016 Initial Evaluation.**

        1.   **SDI's Technical Capability Evaluation.**

        2.   **SDI's Past Performance Evaluation.**

        3.   **SDI's Price Evaluation.**

    D.   **The May 24, 2016 Competitive Range Determination.**

II.  **Procedural History.**

III. **Discussion.**

    A.   **Jurisdiction.**

    B.   **Standing.**

        1.   **Whether SDI Is An Interested Party.**

        2.   **Whether SDI Was Prejudiced By The SOCOM's Alleged Errors.**

    C.   **The Relevant Standards Of Review.**

        1.   **The Standard Of Review For A Motion To Dismiss, Pursuant To RCFC 12(b)(1).**

        2.   **The Standard Of Review For Judgment On The Administrative Record, Pursuant To RCFC 52.1.**

        3.   **The Standard Of Review For Bid Protest.**

        4.   **The Standard Of Review For An Agency's Decision To Establish A Single Offer Competitive Range.**

    D.   **Whether The SOCOM's Determination To Exclude SDI From The Competitive Range Was Contrary To Law, Not Rational, Or Arbitrary And Capricious.**

        1.   **The SOCOM's Evaluation Of SDI's Proposal Under The Technical Capability Factor.**

            a.   **Count I Of The August 1, 2016 Amended Complaint.**

       **b.**   **SDI's August 8, 2016 Motion For Judgment On The Administrative Record.**

       **c.**   **The Government's August 29, 2016 Motion To Dismiss, Cross-Motion For Judgment On The Administrative Record, And Response To Plaintiff's Motion For Judgment On The Administrative Record.**

       **d.**   **SDI's September 12, 2016 Reply In Support Of Plaintiff's Motion For Judgment On The Administrative Record And Response To Motion To Dismiss And Cross-Motion For Judgment On The Administrative Record.**

       **e.**   **The Government's September 26, 2016 Reply In Support Of Its Motion For Judgment On The Administrative Record.**

       **f.**   **The Court's Resolution.**

          **i.**   **Regarding Waiver.**

          **ii.**   **Regarding SDI's Deficiency Under The Recruitment, Retention, And Sustainment Of A Qualified Workforce Subfactor.**

  **2.**   **The SOCOM's Failure To Specify Its Needs In A Manner Designed To Achieve Full And Open Competition.**

       **a.**   **Count II Of The August 1, 2016 Amended Complaint.**

       **b.**   **The Government's August 29, 2016 Motion To Dismiss.**

       **c.**   **SDI's September 12, 2016 Response To Motion To Dismiss.**

       **d.**   **The Government's September 26, 2016 Reply.**

       **e.**   **The Court's Resolution.**

  **3.**   **The SOCOM's Evaluation Of SDI's Proposal Under The Price Factor.**

       **a.**   **Count IV Of The August 1, 2016 Amended Complaint.**

       **b.**   **SDI's August 8, 2016 Motion For Judgment On The Administrative Record.**

       **c.**   **The Government's August 29, 2016 Cross-Motion For Judgment On The Administrative Record, And Response To Plaintiff's Motion For Judgment On The Administrative Record.**

       **d.**   **SDI's September 12, 2016 Reply In Support Of Plaintiff's Motion For Judgment On The Administrative Record.**

       **e.**   **The Government's September 26, 2016 Reply In Support Of Its Motion For Judgment On The Administrative Record.**

       **f.**   **The Court's Resolution.**

**IV.**  **Conclusion.**

## I.    RELEVANT FACTUAL BACKGROUND.[1]

### A.    Overview Of Solicitation No. H92241-15-R-003.

On June 3, 2015, the SOCOM issued a draft Solicitation to procure analytical, technology, and logistic services to support the United States Army Special Operations Command Airborne ("USAOC Abn").[2]  AR at 1.  The draft Solicitation stated that the SOCOM intended to award a Firm Fixed Price/Cost, Indefinite Delivery-Indefinite Quantity contract.  AR at 1.

On October 19, 2015, the SOCOM issued a final Solicitation to procure:

- technical analysis;

- flight test support;

- logistic services;

- network/information technologies; and

- program analysis in support of the Systems Integration and Management Office ("SIMO")[3] and Aviation Maintenance Support Office ("AMSO").[4]

AR at 266.

The minimum value of the proposed contract was $100,000; the maximum value was $140,000,000, over the five-year base contract, plus an optional award of five additional twelve-month ordering periods.  AR at 265.

The October 19, 2015 Solicitation stated that a contract would be awarded, pursuant to Federal Acquisition Regulation ("FAR") part 15, on a "best value" basis.  AR at 372.  The Solicitation added that, "best value" would be determined by weighing three factors: (1) technical

---

[1] The facts cited herein were derived from: SDI's August 1, 2016 Amended Complaint ("Am. Compl. ¶¶ 1–120"); the July 18, 2016 Administrative Record ("AR at 1–4144"); and the September 1, 2016, Correction To Administrative Record ("AR at 426.1–426.34, 4145–4412").

[2] USAOC Abn plans, conducts and supports Special Operations missions worldwide using highly modified aircrafts, including: "the A/MH-6 MELB; the MH-60 Blackhawk; an armed MH-60 variant, known as the Defensive Armed Penetrator (DAP); the MH-47 Chinook, MQ-1C Grey Eagle Unmanned Aerial Systems (UAS) C-12 Passenger and C-27 Cargo aircraft."  AR at 27.

[3] The mission of the SIMO is "to support the integration of new equipment and specialized mission components into the aviation assets of the [USAOC Abn] and its subordinate organizations."  AR at 27.

[4] The mission of the AMSO is "to provide aviation logistics and maintenance technical support to the [USAOC Abn]."  AR at 27.

(management) capability; (2) price; and (3) past performance.  AR at 372.  Technical capability was cited the most important factor, then price, and lastly past performance.  AR at 372.  The Solicitation also stated that "proposals that [were] unrealistic in terms of technical (management) capability or price may be rejected.  AR at 372.  In addition, offerors were "cautioned that one or more deficiencies in any factor or criteria may be grounds for exclusion of the proposal for further consideration for [an] award."  AR at 372.

### 1.    The Technical Capability Factor.

The Solicitation required the SOCOM to consider three technical capability subfactors: (a) management approach; (b) recruitment, retention, and sustainment of a qualified workforce; and (c) the offeror's response to the SOCOM's request for task order proposals ("RFTOPs").  AR at 373.  Each subfactor was rated as "outstanding," "good," "acceptable," "marginal," or "unacceptable."  AR at 374.  A marginal rating indicated that a proposal's risk of unsuccessful performance was high; an unacceptable rating signified that the proposal was not subject to an award.  AR at 374.

### a.    Regarding The Management Approach Subfactor.

The Solicitation required, under the management approach subfactor, that each offeror: "fully substantiate the proposed management approach to providing services that achieve the Government's objective;" provide "resumes for the [listed] key personnel;" and "draft Flight and Ground Operations Procedures ('FGOP') plan."  AR at 365.  The Solicitation added that "[t]he FGOP must comply with and be suitable for flight operations as mandated by the DCMA INST 8210.1 upon date of contract award."  AR at 365.

### b.    Regarding The Recruitment, Retention, And Sustainment Of A Qualified Workforce Subfactor.

The Solicitation also required that the SOCOM "evaluate the offeror's approach to recruitment of an appropriately qualified workforce, including initial phase-in if applicable, and the ability to provide this workforce over the contract term with minimal turnover and replacement of members of the workforce."  AR at 373.  The SOCOM was to evaluate the proposal and determine whether the offeror could "provide employees that meet the requirements of the Professional Labor Categories ['PLC'] and solicitation requirements."  AR at 373.  In addition, the Solicitation required that proposals comply with FAR 52.222-46.[5]  AR at 373.

### c.    Regarding The RFTOP Subfactor.

The Solicitation also explained that the SOCOM intended to award a task order at the time of the contract award.  AR at 365-66.  To facilitate the award and demonstrate understanding of

---

[5] FAR 52.222–46, Evaluation of Compensation for Professional Employees, provides:

(a) Recompetition of service contracts may in some cases result in lowering the compensation (salaries and fringe benefits) paid or furnished professional employees.  This lowering can be detrimental in obtaining the quality of professional services needed for adequate contract performance.  It is therefore in

the task order process, the Solicitation required offerors to provide a proposal for the initial task order, together with a sample task order. AR at 366. Proposals would be evaluated to ensure that the initial task order was awardable and "to assess the offeror's general approach to analyzing and responding to a Government performance requirement[.]" AR at 373.

As to the sample task order, bidders were provided with an actual flight scenario and raw data, including "longitudinal static and long term dynamic stability Pulse Code Modulation (PCM) recordings." AR at 368. Based on this information, bidders were required to "generate conclusions and recommendations regarding the longitudinal stability of the UH-60L [helicopter]." AR at 368. Conclusions were to be presented in a flight test report that included data reduction, findings, and

---

the Government's best interest that professional employees, as defined in 29 C.F.R. 541, be properly and fairly compensated. As a part of their proposals, offerors will submit a total compensation plan setting forth salaries and fringe benefits proposed for the professional employees who will work under the contract. The Government will evaluate the plan to assure that it reflects a sound management approach and understanding of the contract requirements. This evaluation will include an assessment of the offeror's ability to provide uninterrupted high-quality work. The professional compensation proposed will be considered in terms of its impact upon recruiting and retention, its realism, and its consistency with a total plan for compensation. Supporting information will include data, such as recognized national and regional compensation surveys and studies of professional, public and private organizations, used in establishing the total compensation structure.

(b) The compensation levels proposed should reflect a clear understanding of work to be performed and should indicate the capability of the proposed compensation structure to obtain and keep suitably qualified personnel to meet mission objectives. The salary rates or ranges must take into account differences in skills, the complexity of various disciplines, and professional job difficulty. Additionally, proposals envisioning compensation levels lower than those of predecessor contractors for the same work will be evaluated on the basis of maintaining program continuity, uninterrupted high-quality work, and availability of required competent professional service employees. Offerors are cautioned that lowered compensation for essentially the same professional work may indicate lack of sound management judgment and lack of understanding of the requirement.

(c) The Government is concerned with the quality and stability of the work force to be employed on this contract. Professional compensation that is unrealistically low or not in reasonable relationship to the various job categories, since it may impair the Contractor's ability to attract and retain competent professional service employees, may be viewed as evidence of failure to comprehend the complexity of the contract requirements.

(d) Failure to comply with these provisions may constitute sufficient cause to justify rejection of a proposal.

48 C.F.R. 52.222-46(a)–(d).

supporting data plots.  AR at 368.  In addition, the Solicitation required that the flight test report "[p]rovide detailed engineering analysis" and satisfy "Army Standards for Technical Writing, Analysis and Reporting" as set out in ATTC 70-2.  AR at 369.

### 2.    The Price Factor.

Regarding the price factor, the Solicitation stated that the SOCOM would consider five subfactors: completeness; compliance with the instructions; price reasonableness; indefinite delivery-indefinite Quantity total evaluated price; and price realism.  AR at 374.  Offerors also were required to complete the PLC pricing schedule attached to the Solicitation.  AR at 370.  The schedule worksheet required that offerors provide direct labor, fringe benefits, general and administrative costs, and overhead rates, resulting in a monthly total for each of the 105 PLCs for the five-year base period and for the five, twelve-month term options.  AR at 142 (sample PLC pricing schedule).

### 3.    The Past Performance Factor.

Regarding the past performance factor, the Solicitation stated that the SOCOM would consider "the relevancy and the risk associated with performing the current effort based upon the offeror's prior performance."  AR at 374.  Past performance was to be evaluated by four subfactors: quality of performance; management effectiveness; customer satisfaction; and timeliness.  AR at 375.

In addition, the Solicitation required that the SOCOM consider the "currency," "relevancy," and "trends" of past performance information.  AR at 375.  The Solicitation defines "currency" as "performance occurring within three years of the solicitation release date."  AR at 375.  "Relevancy" was defined as "providing similar services as required by the Professional Labor Categories during the contract term."  AR at 375.  The Solicitation also required that an offeror's experience be evaluated as "very relevant," "relevant," "somewhat relevant" or "not relevant."  AR at 376.

Each proposal also would receive a "confidence rating," based on past performance.  AR at 375.  This rating was expected to reflect the SOCOM's confidence that an offeror successfully could perform the contract.  A proposal would receive one of four confidence ratings: substantial confidence; satisfactory confidence; limited confidence; or no confidence.  AR at 376.  If an offeror presented "no recent/relevant performance record" or "the offeror's performance record [was] so sparse that no meaningful confidence assessment rating [could] be reasonably assigned," the SOCOM would assign the offer a "neutral" rating.  AR at 376.

### B.    Objections To The Terms Of Solicitation No. H92241-15-R-0003.

On August 10, 2015, SDI's agent, Avista Strategies, Inc. ("Avista"), submitted a letter to the SOCOM's Contracting Officer ("CO") objecting to portions of the June 3, 2015 draft Solicitation.  AR at 5.  Specifically, Avista complained that "the requirement for the key personnel [were too] restrictive, almost as if the requirements mirror the qualification of a particular individual."  AR at 6.  In addition, Avista noted that the draft Solicitation contained an excessive number of PLCs.  AR at 6.

It appears that the CO ignored Avista's August 10, 2015 Objections, so that SDI submitted an October 29, 2015 letter to the SOCOM's Ombudsman, lodging the same objections as Avista. AR at 255.  On November 2, 2015, the SOCOM filed Amendment 1 that revised sections L and M, removed key personnel, and changed the PLC descriptions.  AR at 261–293.  By letter, the Ombudsman explained that several of the changes in Amendment 1 were made in response to objections lodged by SDI.  AR at 259.

On November 6, 2015, the SOCOM also published Amendment 2, changing the relevancy factors for past performance.  AR 371, 375.  Amendment 2 changed the definition of "somewhat relevant past performance" from "a service contract at a minimum of $75 million," to "[a contract with] value in a range of $35 [million] to $75 [million]."  AR at 371.  In addition, Amendment 2 deleted a section of the October 19, 2015 Solicitation, that explained:

> if award will be made without conducting discussions, an offeror may be given the opportunity to clarify certain aspects of their proposals (i.e. the relevance of an offeror's past performance information, as related to this acquisition, adverse past performance information to which the offeror has not previously had an opportunity to respond or to resolve minor clerical errors.

AR at 375.

In response, on November 18, 2015, SDI submitted a timely proposal.  AR at 1145–1646.  Cruz Associates, Inc. ("CAI"), the incumbent contractor, was the only other offeror.  AR at 1647–2486.

### C.   The Source Selection Evaluation Board's May 9, 2016 Initial Evaluation.

On May 9, 2016, the Source Selection Evaluation Board ("SSEB") published an Initial Evaluation Report weighing both proposals.  AR at 2753.  The Initial Evaluation stated that:

> Evaluators read each proposal; analyzed the proposal at the [factor and] subfactor level to determine what the proposal offers, and then compared the offer with the appropriate evaluation standard. . . .  After evaluators completed their individual subfactor evaluation, they met as a group to arrive at a consensus.  The group documented the rationale of their consensus decisions for the official record in the factor summary worksheets.

AR at 2753–54.

As required by the Solicitation, the Initial Evaluation Report also considered the strength of each proposal according to three factors: (1) technical capability; (2) price; and (3) past performance.  AR at 2753 (summarizing evaluation criteria and relative importance of factors).

### 1.   SDI's Technical Capability Evaluation.

The SSEB evaluated SDI's technical capability, based on three subfactors: (1) management approach; (2) recruitment, retention, and sustainment of a qualified workforce; and (3) the offeror's

response to the SOCOM's RFTOPs.   AR at 2754.   The SSEB identified the strengths,[6] weaknesses,[7] or deficiencies[8] of each subfactor and assigned the proposal an overall technical capability rating of "outstanding," "good," "acceptable," "marginal," or "unacceptable."   AR at 2754–55.  Following this process, the SSEB concluded that SDI's "proposal contained numerous weaknesses, two significant weaknesses, and two deficiencies that make the proposal unawardable."   AR at 2771.

Regarding management approach, SDI received two "significant weaknesses."   AR at 4128-39.  First, the SSEB found that "[t]he proposed management approach [did] not adequately substantiate the effective use of key personnel.  Two of the seven proposed key personnel [were] determined not qualified for the respective positions."  AR at 2772.  Second, "[t]he proposal did not provide a draft FGOP that was in compliance with the latest DCMA Instruction 8210.1[.]  [In addition,] significant safety information [was] either formatted incorrectly, misaligned, or missing . . . .  [The FGOP] would require significant revision in order to be determined as 'suitable for flight operations.'"  AR at 2773.

Under the recruitment, retention, and sustainment of a qualified workforce subfactor, the SSEB found that SDI's proposal was deficient, because "professional compensation [was] unrealistically low and is nearly certain [to] be detrimental to satisfactory contract performance."  AR at 2776.  In addition, the SSEB found that "employee direct compensation [would] be reduced by 32.1% from the incumbent workforce levels.  This unrealistically low compensation would be detrimental in obtaining [] quality [] professional services . . .  [and failed to] reflect a clear understanding of the work to be performed."  AR at 2776 (internal quotation marks omitted).

Finally, the SSEB found that SDI's RFTOPs contained one deficiency and several weaknesses.  AR at 2777–81.  The SSEB found that SDI's RFTOPs were deficient, because they failed to demonstrate a sufficient understanding of how to gather and analyze static stability test data and failed to use "industry-standard analysis techniques, such as those presented in USNTPS FTM 107."  AR at 2777.  The SSEB also found that the proposal contained contradictory statements and failed to present critical data appropriately.  AR at 2777.  And, the SSEB found that SDI's RFTOPs contained several weaknesses; most of which involved formatting errors and

---

[6] The May 9, 2016 Initial Evaluation Report defined "strength" as "a feature, item, technique or methodology of an offeror's proposal [that] stands out as a significant benefit to enhance the effective execution of the program."  AR at 2755.

[7] The FAR defines "weakness" as "an omission or a flaw in the proposal that increases the risk of unsuccessful performance."  48 C.F.R. 15.001.  A "significant weakness" is defined as "a flaw in the submission that appreciably increases the risk of unsuccessful contract performance."  48 C.F.R. 15.001.

[8] The FAR defines "deficiency" as "a material failure of a proposal to meet a Government requirement or a combination of significant weaknesses in a proposal that increases the risk of unsuccessful performance to an unacceptable level."  48 C.F.R. 15.001.

an alleged failure to analyze engineering flight test data, instead of directly evaluating the mission tasks.  AR at 2778–81.

### 2.    SDI's Past Performance Evaluation.

The SSEB found that, because SDI did not provide any past performance reference where it performed as the prime contractor, SDI was assigned a "neutral" confidence rating.  AR at 2783.

### 3.    SDI's Price Evaluation.

The SSEB found that SDI's price included a 32.1 percent reduction in average employee compensation, compared to incumbent levels.  AR at 2783.  The Initial Evaluation explained that "[t]he methodology described in the proposal . . . appears to have used local and regional labor rates as opposed [to] national rates[.]"  AR at 2783.  Because of the Solicitation's complex labor categories, however, personnel must be recruited nationally.  AR at 2783.  For this reason, the SSEB concluded that SDI's proposed compensation rates were unrealistically low.  AR at 2783.

## D.    The May 24, 2016 Competitive Range Determination.

On May 24, 2016, the CO issued a Competitive Range Determination, excluding SDI.  AR at 2873.  CAI, however, was included in the competitive range.  AR at 2873.  Because the SOCOM did not receive any other offers, the CO's determination established a competitive range of one offeror.  AR at 2873.  In support, the CO cited the SSEB's Initial Evaluation, recommending that:

> Due to SDI's significant weaknesses and deficiencies, the proposal does not meet requirements and is deemed UNAWARDABLE.

> Cruz Associates Inc. had numerous technical strengths, a few weaknesses, and one significant weakness.  The SSEB has serious concern that significant cuts in salaries could result in a high turnover rate upon contract award and pose significant difficulty in recruiting replacements. . . .  [But, the] overall proposal was deemed

> ACCEPTABLE and overall risk of unsuccessful performance is MODERATE[.] . . . [For these reasons,] [t]he SSEB recommends establishing a competitive range of one offeror, Cruz Associates Inc.

AR at 2787.

## II.    PROCEDURAL HISTORY.

On June 17, 2016, SDI filed a Complaint ("Compl."), under seal, in the United States Court of Federal Claims, protesting the SOCOM's decision to remove SDI from the competitive range and seeking "to enjoin the [SOCOM] from proceeding to award [the contract]."  On that same day, SDI filed an Application For Temporary Restraining Order and a Motion For Entry Of Preliminary Injunction.  ECF No. 5.

On June 20, 2016, the court convened a status conference during which the Government represented that the SOCOM would not award the contract until resolution of this bid protest.  On

June 21, 2016, CAI filed a Motion To Intervene.  ECF No. 13.  On June 22, 2016, the Government filed, under seal, an Unopposed Motion For Protective Order.  ECF No.  16.  That same day, the court granted CAI's June 21, 2016 Motion To Intervene.  The court, however, denied SDI's June 17, 2016 Application For A Temporary Restraining Order and reserved judgment on the June 17, 2016 Motion For Preliminary Injunctive Relief.  ECF No. 17.

On July 14, 2016, the Government filed a Joint Proposed Briefing Schedule.  ECF No. 26. On July 15, 2016, the court entered the Proposed Briefing Schedule.  ECF No. 27.  On July 18, 2016, the Government filed a Notice Of Filing Administrative Record.  ECF No. 28.  On July 22, 2016, the Government filed, under seal, a Motion To Supplement The Administrative Record. ECF Nos. 30.

On August 1, 2016, SDI filed, under seal, an Amended Complaint, including four counts ("Am. Compl.").  On August 8, 2016, SDI filed, under seal, a Motion For Judgment On The Administrative Record And Memorandum Brief In Support Thereof ("Pl. Mot.").  On August 9, 2016, the court granted the Government's July 22, 2016 Motion To Supplement The Administrative Record, in light of SDI's representation, that it did not object.  ECF No. 33.

On August 29, 2016, the Government filed, under seal, a Numbered Version Of Administrative Record Supplementation.  ECF No. 35.  On that same day, the Government filed a Motion To Dismiss, Cross-Motion For Judgment On The Administrative Record, and a Response To Plaintiff's Motion For Judgment On The Administrative Record ("Gov't Resp.").  And CAI filed a Cross-Motion For Judgment On The Administrative Record, Opposition To Plaintiff's Motion For Judgment On The Administrative Record And Memorandum In Support Thereof ("CAI Resp.").

On September 1, 2016, SDI filed, under seal, a Correction To Administrative Record to include Tabs 15a and 44–50.  ECF Nos. 37, 38.  On September 7, 2016, SDI filed, under seal, a Motion To Supplement Administrative Record.  ECF No. 39.

On September 12, 2016, SDI filed, under seal, a Reply In Support Of Plaintiff's Motion For Judgment On The Administrative Record And Response To Motion To Dismiss And Cross-Motions For Judgment On The Administrative Record ("Pl. Reply").

On September 26, 2016, the Government filed, under seal, a Response To Plaintiff's Motion To Supplement The Administrative Record.  ECF No. 42.  The Government also filed a Reply In Support Of Its Cross-Motion For Judgment On The Administrative Record ("Gov't Reply").  That same day, CAI filed a Reply In Support Of Its Cross-Motion For Judgment On The Administrative Record ("CAI Reply").

## III.  DISCUSSION.

### A.  Jurisdiction.

Pursuant to the Administrative Dispute Resolution Act of 1995 ("ADRA"), the United States Court of Federal Claims has jurisdiction:

to render judgment on an action by an interested party objecting to a solicitation by a Federal agency or proposals for a proposed contract or to a proposed award of a contract or any alleged violation of statute or regulation *in connection with a procurement or a proposed procurement.*

28 U.S.C. § 1491(b)(1) (emphasis added).

The August 1, 2016 Amended Complaint alleged several violations of law and/or regulation "in connection with" the SOCOM's decision to eliminate SDI from the competitive range, under Solicitation No. H92241-15-R-003. Specifically, Counts I and III allege that the SOCOM's evaluation of SDI's technical capability and past performance were contrary to the terms of the Solicitation and therefore arbitrary and capricious, an abuse of discretion, and contrary to applicable law. Am. Compl. ¶¶ 68, 111. Count II alleges that the Solicitation failed to specify the SOCOM's needs in a manner designed to achieve full and open competition, as required by the FAR. Am. Compl. ¶ 100 (citing *Glenn Def. Marine (Asia) PTE Ltd. v. United States*, 97 Fed. Cl. 568, 578 (2011) ("As a general rule, offerors must be given sufficient detail in an RFP to allow them to compete intelligently and on a relatively equal basis.")). Count IV alleges that the SOCOM's evaluation of SDI's proposed price was contrary to FAR 15.404-1(d)(3).[9] Am. Compl. ¶ 115.

Title 28 U.S.C. § 1491(b)(3), however, states that "[i]n exercising jurisdiction under this subsection, the courts shall give due regard to . . . expeditious resolution of the action." 28 U.S.C. § 1491(b)(3). The appeals court, in *Blue & Gold Fleet, L.P. v. United States*, interpreted section 1491(b)(3) to mean that "a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims." *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007).

"It is well settled . . . that the [United States] is ordinarily immune from suit, and that *it may define the conditions under which it will permit such actions*." *Honda v. Clark*, 386 U.S. 484, 501 (1967) (emphasis added). For this reason, the Supreme Court has held that "[w]hen waiver legislation contains a statute of limitations, the limitations provision constitutes a condition on the waiver of sovereign immunity." *Block v. N. Dakota ex rel. Bd. of Univ. & Sch. Lands*, 461 U.S.

---

[9] FAR 15.404-1(d)(3) provides:

Cost realism analyses may also be used on competitive fixed-price incentive contracts or, in exceptional cases, on other competitive fixed-price-type contracts when new requirements may not be fully understood by competing offerors, there are quality concerns, or past experience indicates that contractors' proposed costs have resulted in quality or service shortfalls. Results of the analysis may be used in performance risk assessments and responsibility determinations. *However, proposals shall be evaluated using the criteria in the solicitation, and the offered prices shall not be adjusted as a result of the analysis.*

48 C.F.R. 15.404-1(d)(3) (emphasis added).

273, 287 (1983).  Much like a statute of limitations, *Blue & Gold Fleet* articulates a procedural requirement that must be met, before a plaintiff can bring a bid protest in the United States Court of Federal Claims.  Accordingly, the court has determined that the *Blue and Gold Fleet* waiver rule is a condition on jurisdiction, under section 1491(b).

In this case, the Government argues that the court should dismiss Counts I and II of the August 1, 2016 Amended Complaint for failure to state a claim upon which relief may be granted, pursuant to Rule of the United States Court of Federal Claims ("RCFC") 12(b)(6), because SDI failed to raise the objections alleged in those counts before the bidding process closed.  Gov't Resp. at 19.  For the reasons provided above, however, the court has determined that the waiver rule articulated in *Blue & Gold Fleet* is a jurisdictional requirement that is more appropriately addressed under RCFC 12(b)(1).  Whether SDI waived the claims alleged in Counts I and II is addressed below.

## B.      Standing.

Under 28 U.S.C. § 1491(b)(1), standing is a threshold issue.  *See Myers Investigative & Sec. Servs. v. United States*, 275 F.3d 1366, 1369–70 (Fed. Cir. 2002) ("[S]tanding is a threshold jurisdictional issue.").  To establish standing under the Tucker Act, a bid protester must demonstrate that the protestor: (1) is an "interested party;" and (2) was prejudiced by alleged errors in the procurement process.  *See Myers*, 275 F.3d at 1370 (holding that standing under § 1491(b)(1) is limited to interested parties); *see also See Labatt Food Serv., Inc. v. United States*, 577 F.3d 1375, 1378–79 (Fed. Cir. 2009) ("It is basic that because the question of prejudice goes directly to the question of standing, the prejudice issue must be reached before addressing the merits.").  Moreover, the protestor must establish standing on a claim-by-claim basis.  *Lewis v. Casey*, 518 U.S. 343, 358 (1996) ("[S]tanding is not dispensed in gross.  If the right to complain of one administrative deficiency automatically conferred the right to complain of all administrative deficiencies, any citizen aggrieved in one respect could bring the whole structure of state administration before the courts for review.  That is of course not the law.").

### 1.      Whether SDI Is An Interested Party.

The United States Court of Appeals for the Federal Circuit has construed the term "interested party" under 28 U.S.C. § 1491(b)(1) to be synonymous with "interested party," as defined by the Competition In Contracting Act ("CICA"), 31 U.S.C. § 3551(2)(A).  *See Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir.2006) (citing decisions adopting the CICA definition of "interested party" for 28 U.S.C. § 1491(b)(1) purposes).  Under 31 U.S.C. § 3551(2)(A), a protestor is an "interested party" if the protestor: (1) was an actual or prospective bidder or offeror; and (2) has a direct economic interest in the procurement or proposed procurement.  *See Distrib. Solutions, Inc. v. United States*, 539 F.3d 1340, 1344 (Fed. Cir. 2008).  A protestor that is eliminated from the competitive range may have an economic interest in the proposed procurement if, after a successful protest, "the government would be obligated to rebid the contract, and appellant could compete for the contract once again."  *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1334 (Fed. Cir. 2001).

In this case, SDI submitted a timely proposal in response to the Solicitation.  AR at 1145–1646.  SDI was therefore "an actual . . . bidder or offeror," satisfying the first element of the

"interested party" test.  *See Distrib. Solutions,* 539 F.3d at 1344.  In addition, the August 1, 2016 Amended Complaint alleges that the SOCOM's evaluation of SDI's proposal was contrary to the terms of the Solicitation and the FAR.  Am. Compl. ¶¶ 68, 100, 111, 115.  If established, these allegations would render the SOCOM's decision to eliminate SDI from the competitive range contrary to applicable law as well as arbitrary and capricious, and an abuse of discretion.  *See Impresa,* 238 F.3d at 1332 (holding that an agency's procurement procedure is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law when it "involved a violation of regulation or procedure [established in the Solicitation]").  Accordingly, the SOCOM would be obligated to rebid the contract, and SDI could compete for the contract once again.  *C.A.C.I., Inc.-Fed. v. United States,* 719 F.2d 1567, 1575 (Fed. Cir. 1983) ("[A determination that an agency's procurement process was arbitrary and capricious] would require the government, if it wants to go ahead with the procurement, to repeat the bidding process under circumstances that would eliminate the alleged taint of the prior proceedings.").  For these reasons, SDI established a direct economic interest in the proposed procurement, satisfying the second element of the "interested party" test.

## 2.    Whether SDI Was Prejudiced By The SOCOM's Alleged Errors.

Standing also requires the protestor to demonstrate prejudice.  *See  Myers,* 275 F.3d 1366, 1370 (Fed. Cir. 2002) ("[P]rejudice (or injury) is a necessary element of standing.").  "A party has been prejudiced when it can show that but for the error, it would have had a substantial chance of securing the contract."  *See Labatt,* 577 F.3d at 1378; *see also Bannum, Inc. v. United States,* 404 F.3d 1346, 1358 (Fed. Cir. 2005) ("To establish 'significant prejudice' [the protestor] must show that there was a 'substantial chance' it would have received the contract award but for the [alleged] errors . . . [.]").  "In other words, the protestor's chance of securing the award must not have been insubstantial*." Info. Tech. & Applications Corp. v. United States,* 316 F.3d 1312, 1319 (Fed. Cir. 2003).

Regarding Counts I and IV, the August 1, 2016 Amended Complaint alleges that the SOCOM assigned SDI's proposal two deficiencies under the technical capability factor, based on an assessment that did not comply with the terms of the Solicitation.  Am. Compl. at ¶¶ 71, 116.  "Each of these errors, separately and collectively . . . alter[ed] [the] evaluation criteria and the [SOCOM]'s consideration thereunder.  Am. Compl. at ¶ 97.  Had the SOCOM evaluated SDI's proposal in accordance with the Solicitation, however, SDI would not have received either deficiency.  Am. Compl. at ¶¶ 97, 120.  Similarly, Count II alleges that both of the deficiencies that SDI received, "were the direct result of the [SOCOM]'s nondisclosure of its labor mix and restrictive staffing profiles."  Am. Compl. at ¶ 103.  Had the SOCOM provided SDI with the information that it did not have, regarding labor mix and staffing profiles, SDI would not have received either deficiency.  Am. Compl. at ¶ 107.

SDI's exclusion from the competitive range was caused by the SOCOM's determination that SDI's bid contained "one or more deficiencies."  AR at 2787, 4144.  But for the errors alleged in Counts I, II and IV, however, SDI's proposal would not have received any deficiencies and would have been included in a competitive range of two.  In addition, SDI and CAI received roughly the same number of strengths (AR at 2855, 57, 58, 61) and  "[t]he SSEB ha[d] serious concern that [CAI's] [proposed] cuts in salaries could result in a high turnover rate . . . and pose significant difficulty in recruiting replacements," (AR at 2787).  Absent those errors, SDI would

have had "a substantial chance of securing the contract." *See Labatt*, 577 F.3d at 1378. For these reasons, the court has determined that SDI established prejudice regarding Counts I, II and IV of the August 1, 2016 Amended Complaint.

Count III, however, alleges that the SOCOM inappropriately assigned SDI a "neutral/not relevant" rating under the past performance factor. Am. Compl. at ¶ 111. "Had the [SOCOM] evaluated SDI's past performance on the basis of the Solicitation's requirements, it would have determined that SDI had substantial experience in the areas required by the Solicitation. SDI would therefore not have received a [n]eutral rating, but very likely a higher rating than the one it received." Am. Compl. at ¶ 112. The May 9, 2016 Initial Evaluation, however, explained that SDI's proposal was "unawardable," because it contained "significant weaknesses and deficiencies" under the technical capability factor, not because it lacked relevant experience under the past performance factor. AR at 2787. Similarly, SDI's pre-award debriefing reported that SDI's proposal was unacceptable, because it "contains one or more deficiencies." AR at 4144. Therefore, a higher past performance rating would not have changed the SOCOM's determination to exclude SDI from the competitive range. Accordingly, SDI was not prejudiced by the error alleged in Count III of the August 1, 2016 Amended Complaint.

For these reasons, the court has determined that SDI has standing to challenge the SOCOM's determination to exclude SDI's proposal from the competitive range as alleged in Counts I, II and IV of the August 1, 2016 Amended Complaint. SDI, however, has not established prejudice, and therefore does not have standing, to challenge its exclusion from the competitive range on the grounds alleged in Count III.

**C.    The Relevant Standards Of Review.**

**1.    The Standard Of Review For A Motion To Dismiss, Pursuant To RCFC 12(b)(1).**

A challenge to the United States Court of Federal Claims' "general power to adjudicate in specific areas of substantive law . . . is properly raised by a [Rule] 12(b)(1) motion[.]" *Palmer v. United States*, 168 F.3d 1310, 1313 (Fed. Cir. 1999); *see also* RCFC 12(b)(1) ("Every defense to a claim for relief in any pleading must be asserted in the responsive pleading. . . . But a party may assert the following defenses by motion: (1) lack of subject-matter jurisdiction[.]"). When considering whether to dismiss an action for lack of subject matter jurisdiction, "a court must accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff." *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011).

**2.    The Standard Of Review For Judgment On The Administrative Record, Pursuant To RCFC 52.1.**

In this case, the parties filed Cross-Motions For Judgment On The Administrative Record, pursuant to RCFC 52.1. The court should treat a judgment on the administrative record as an expedited trial on the record. *See Bannum*, 404 F.3d at 1356. Therefore, the existence of material issues of fact does not prohibit the court from granting a RFCF 52.1 motion. *Id*. at 1354. Instead, the court can base its ultimate determination on "factual findings from the record evidence." *Id*.

Moreover, while "factual disputes may percolate throughout an administrative record," *Ellsworth Assocs., Inc. v. United States*, 45 Fed. Cl. 388, 393 (1999), the court must follow a "presumption of regularity" and uphold the agency's action "as long as a rational basis is articulated and relevant factors are considered," *Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1085 (Fed. Cir. 2001) (quoting *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415 (1971)).

### 3.     The Standard Of Review For Bid Protest.

Pursuant to the Tucker Act, as amended by the Administrative Dispute Resolution Act, Pub. L. No. 104-320 § 12, 110 Stat. 3870, 3874 (Oct. 19, 1996), Congress authorized the United States Court of Federal Claims to review challenges to agency decisions, pursuant to the standards set forth in the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. *See* 28 U.S.C. § 1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."); *see also* 5 U.S.C. § 706(2)(A) ("The reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]"); *Banknote Corp. of Supp., Inc. v. United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004) ("Among the various APA standards of review in section 706, the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A): a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'") (citations omitted).

The United States Court of Appeals for the Federal Circuit has held that the court's primary responsibility is to determine whether a federal agency violated a federal statute or regulation in the procurement process and whether any such violation was prejudicial. *See Axiom Res. Mgmt. v. United States*, 564 F.3d 1374, 1381 (Fed. Cir. 2009) (holding that "the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations") (internal quotation marks and citations omitted); *see also Banknote Corp.*, 365 F.3d at 1351 (holding, when challenging a government contract procurement due to a violation of law or procedure, "the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations") (citations omitted). As part of this inquiry, the court must determine whether the agency's proposal evaluations were consistent with the evaluation scheme described in the relevant solicitation. *See* 48 C.F.R. § 15.305(a) (2007) ( "An agency shall evaluate competitive proposals and then assess their relative qualities solely on the factors and subfactors specified in the solicitation.").

If a federal agency's action is challenged, because it was made without a rational basis, the trial court must "determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, so that the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis." *Centech Group, Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009); *see also Savantage Fin. Servs. Inc. v. United States*, 595 F.3d 1282, 1287 (Fed. Cir. 2010) ("We must sustain an agency action unless the action does not evince rational reasoning and consideration of relevant factors.") (internal alterations, quotations and citations omitted); *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1368-69 (Fed. Cir. 2009) ("We have stated that procurement decisions invoke[] highly deferential rational basis review . . . [u]nder that standard, we sustain an agency action evincing rational reasoning and consideration of relevant factors.") (internal quotations and citations omitted).

Finally, if a federal agency's action is challenged on the grounds that an agency has acted in an arbitrary or capricious manner, the court may intervene "only in extremely limited circumstances." *United States v. John C. Grimberg Co.*, 702 F.2d 1362, 1372 (Fed. Cir. 1983). Courts have held that a federal agency's decision to be arbitrary and capricious, if it "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983).

### 4.  The Standard Of Review For An Agency's Decision To Establish A Single Offer Competitive Range.

In *Birch & Davis Int'l, Inc. v. Christopher*, the United States Court of Appeals for the Federal Circuit held that "if [a] contracting officer has determined an initial competitive range of one, there must be a clear showing that the excluded bids [had] 'no reasonable chance' of being selected." *Birch & Davis Int'l, Inc. v. Christopher*, 4 F.3d 970, 974 (Fed. Cir. 1993). The appellate court's holding was a statutory interpretation of FAR 15.609(a) (1992), that states: "[t]he competitive range . . . *shall include all proposals that have a reasonable chance of being selected for award*." *Id*. at 973 ("[T]he FAR does not allow a contracting officer to eliminate competitors from the initial competitive range if there is any 'reasonable chance' that they will be selected."); 48 C.F.R. 15.609(a) (1992) (emphasis added). But, "[t]he FAR standard for inclusion in the competitive range was changed in 1997 to be much narrower[.]" *USfalcon, Inc. v. United States*, 92 Fed. Cl. 436, 459 (2010). At that time, FAR 15.609(a) (1992) was replaced by FAR 15.306(c), that states: "the contracting officer shall establish a competitive range *comprised of all of the most highly rated proposals*, unless the range is further reduced for purposes of efficiency . . . [.]" 48 C.F.R. 15.306(c)(1).

Under FAR 15.306(c), the agency has greater discretion in establishing a single offer competitive range, because the FAR no longer encourages contracting officers to include marginal proposals with a "reasonable chance of being selected for award." *See USfalcon*, 92 Fed. Cl. at 459 ("[T]he FAR itself is no longer cause to follow the approach to review taken in the old precedents, which were applying the now-obsolete 'reasonable chance' . . . standard."); *but see L-3 Commc'ns EOTech, Inc. v. United States*, 83 Fed. Cl. 643, 650 (2008) ("[The United States Court of Federal Claims] has interpreted the language of FAR 15.306(c)(1) to require close scrutiny when an agency establishes a competitive range of only one offeror . . . [.]"). Instead, the contracting officer may narrow the competitive range to include only "the most highly rated proposals." 48 C.F.R. 15.306(c). For these reasons, the court has determined that the usual "arbitrary and capricious" standard applies to the court's review of the SOCOM's decision to establish a single offer competitive range. *Cf. USfalcon*, 92 Fed. Cl. at 461 (reviewing agency decision to establish a single offer competitive range, under "arbitrary and capricious" standard).

D.   **Whether The SOCOM's Determination To Exclude SDI From The Competitive Range Was Contrary To Law, Not Rational, Or Arbitrary And Capricious.**

1.   **The SOCOM's Evaluation Of SDI's Proposal Under The Technical Capability Factor.**

a.   **Count I Of The August 1, 2016 Amended Complaint.**

Count I alleges that the SOCOM's decision to assign SDI's proposal a deficiency under the RFTOP subfactor was contrary to law, arbitrary and capricious, and an abuse of discretion. Am. Compl. ¶ 79. The SOCOM assigned SDI a deficiency under the RFTOP subfactor, because SDI's sample task order did not use "industry-standard analysis techniques such as those presented in USNTPS FTM 107" and failed to "present data addressing longitudinal stick position at off-trim speeds 'appropriately' to analyze control position gradient." Am. Compl. at ¶ 79. But, Count I also alleges that the Solicitation "withheld vital information about testing techniques." Am. Compl. at ¶ 80. For example, "[c]ritical to a successful evaluation of the experimental test data . . . was the knowledge that one of the data sets was generated from static stability test procedures described by USNTPS FTM 107," but the Solicitation "provided no information about the test procedures used to generate the data sets and made no reference to USNTPS FTM 107." Am. Comp. at ¶¶ 81, 83. Therefore, SDI's deficiency under the RFTOP subfactor was "directly attributable to the [SOCOM]'s failure to provide basic testing information." Am. Compl. at ¶ 84.

In addition, Count I alleges that the SOCOM's assessment of SDI's proposal under the qualified workforce subfactor was contrary to the terms of the Solicitation. Am. Compl. at ¶ 78. The SOCOM assigned SDI's approach to the recruitment, retention and sustainment of a qualified workforce a deficiency, because SDI's compensation package was unrealistically low. Am. Compl. at ¶ 72. But, the SOCOM evaluated SDI's proposed compensation based solely on direct salary rates, instead of SDI's entire compensation package, including fringe benefits, as required by the Solicitation. Am. Compl. at ¶ 73.

b.   **SDI's August 8, 2016 Motion For Judgment On The Administrative Record.**

SDI argues that the SOCOM evaluated the RFTOP in a manner contrary to applicable law, because the evaluation was based on factors not specified in the Solicitation. Pl. Mot. at 20 (citing 10 U.S.C. § 2305(b)(1) ("The head of an agency shall evaluate sealed bids and competitive proposals and make an award based solely on the factors specified in the solicitation."). Specifically, an offeror would not know to [plot airspeed versus longitudinal stick position at off-trim speeds and calculate the gradient of the resulting curve] unless it knew . . . that the data provided resulted from [USNTPS] FTM 107 test procedures." The Solicitation, however, did not disclose that information.   Pl. Mot. at 18. The SOCOM's assessment that SDI's RFTOP was deficient, because it failed to include data addressing longitudinal stick position at off-trim speeds appropriately to analyze control position gradient was inconsistent with the terms of the Solicitation. Pl. Mot. at 18, 20.

SDI also contends that the SOCOM's evaluation of SDI's proposed compensation package, under the recruitment, retention, and sustainment of a qualified workforce subfactor, was contrary to law, arbitrary and capricious, and an abuse of discretion, because this assessment deviated from the terms of the Solicitation. Pl. Mot. at 16. (citing *L-3 Commc'ns EOTech*, 83 Fed. Cl. at 654 ("When the evaluation of proposals materially deviates from the evaluation scheme described in the solicitation, the agency's failure to follow the described plan may constitute evidence of arbitrary and capricious decision-making.")). The Solicitation required the SOCOM to evaluate total compensation, including fringe benefits. Pl. Mot. at 14. The SOCOM, however, evaluated SDI's compensation package based on proposed salaries alone. Pl. Mot. at 15.

### c. The Government's August 29, 2016 Motion To Dismiss, Cross-Motion For Judgment On The Administrative Record, And Response To Plaintiff's Motion For Judgment On The Administrative Record.

The Government responds that SDI waived its objection to the Solicitation's nondisclosure of the techniques used to generate the RFTOP data sets, because SDI did not raise that objection before the bidding process closed. Gov't Resp. at 15 (citing *Blue & Gold Fleet*, 492 F.3d at 1313 ("[A] party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims.")). Accordingly, the court should dismiss those portions of Count I alleging that the Solicitation's failure to disclose that RFTOP data sets were generated using techniques described in USNTPS FTM 107 was contrary to law, arbitrary and capricious, and an abuse of discretion. Gov't Resp. at 19.

In addition, the SOCOM's evaluation of the proposed compensation packages did not deviate from the terms of the Solicitation. Gov't Resp. at 36. The Solicitation required the SOCOM to ensure that proposed "salary rates or ranges [] [took] into account differences in skills, the complexity of various disciplines, and professional job difficulty. . . . Failure to comply with these provisions may constitute sufficient cause to justify rejection of a proposal." Gov't Resp. at 37 (quoting 48 C.F.R. 52.222-46(b), (d)). Therefore, the SOCOM's determination that SDI's proposed salaries were "unrealistically low" and "would be detrimental in obtaining the quality of professional services needed for adequate contract performance" was consistent with the Solicitation's requirements. Gov't Resp. at 41.

### d. SDI's September 12, 2016 Reply In Support Of Plaintiff's Motion For Judgment On The Administrative Record And Response To Motion To Dismiss And Cross-Motion For Judgment On The Administrative Record.

SDI responds that *Blue & Gold Fleet* only applies to objections about the express terms of the solicitation—not to an agency deviation from the Solicitation evaluation process. Pl. Reply at 2. Count I does not object to the terms of the Solicitation, but to the "unstated evaluation factors [that] the [SOCOM] employed" during its assessment of SDI's RFTOP. Pl. Reply at 3.

In addition, the SOCOM's assessment of its proposal under the recruitment, retention, and sustainment of a qualified workforce subfactor was arbitrary and capricious, because the SOCOM based its evaluation solely on salary rates and did not consider SDI's total compensation, as required by the Solicitation.  Pl. Reply at 5.

> ### e.        The Government's September 26, 2016 Reply In Support Of Its Motion For Judgment On The Administrative Record.

The Government replies that SDI waived its right to contest the SOCOM's evaluation of the RFTOP subfactor, because SDI's concerns are based on the terms of the Solicitation, but SDI did not register those concerns prior to the closure of the bidding process.  Gov't Reply at 3.  SDI attempts to characterize its protest as "based on alleged errors in [the SOCOM's] evaluations." Gov't Reply at 2.  But, Count I's allegation that "the Agency withheld vital information about testing techniques used to generate sample data" describes the Solicitation's terms, not the SOCOM's evaluation method.  Gov't Reply at 3 (quoting Am. Compl. at ¶ 80).

Moreover, SDI did not respond to the Government's argument that the Solicitation required the SOCOM to evaluate proposed salary rates to ensure that they accounted for differences in skills, the complexity of various disciplines, and professional job difficulty.  Gov't Reply at 13. And, that failure to comply with these provisions may constitute sufficient cause to justify rejection of a proposal.  Gov't Reply at 13.  SDI also failed to respond to "the Federal Circuit's acceptance of a focus on salaries, as a pivotal part of total compensation."  Gov't Reply at 13.  Therefore, SDI has not shown that the SOCOM's evaluation of SDI's approach to the recruitment, retention and sustainment of a qualified workforce was contrary to law, arbitrary and capricious, and an abuse of discretion.  Gov't Reply at 13.

> ### f.        The Court's Resolution.

> ### i.        Regarding Waiver.

"A party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims." *Blue & Gold Fleet*, 492 F.3d at 1313.  A defect is "patent" if it is "an obvious omission, inconsistency or discrepancy of significance." *E.L. Hamm & Assocs., Inc. v. England*, 379 F.3d 1334, 1339 (Fed. Cir. 2004).  By contrast, a latent ambiguity is a "hidden or concealed defect which is not apparent on the face of the document, could not be discovered by reasonable and customary care, and is not so patent and glaring as to impose an affirmative duty on plaintiff to seek clarification." *Per Aarsleff A/S v. United States*, 829 F.3d 1303, 1312 (Fed. Cir. 2016) (quoting *Analytical & Research Tech., Inc. v. United States*, 39 Fed.Cl. 34, 46 (1997)).

SDI argues that the *Blue & Gold Fleet* waiver rule does not apply to Count I's allegations regarding the RFTOP subfactor, because *Blue & Gold Fleet* only applies to challenges to the terms of the Solicitation, not challenges based on alleged errors in agency evaluations.  Pl. Reply at 2 (citing *Caddell Constr. Co., Inc. v. United States*, 111 Fed. Cl. 49, 74 (2013) ("Because plaintiff is not challenging the terms of . . . the Solicitation, but rather [the agency's] evaluation of [plaintiff's] submissions . . ., the *Blue & Gold Fleet, L.P. v. United States* waiver rule . . . [does]

not apply.")).  Count I, however, alleges that: the SOCOM "withheld vital information about [the] testing methods used to generate sample data;" "[t]he sample RFTOP provided no information about the test procedures used to generate the data sets;" and "[t]he reasons proffered by the Agency for the second deficiency, as well as many of the weaknesses associated with the sample RFTOP, are directly attributable to the Agency's failure to provide basic testing information." Am. Comp. at ¶ 80, 83, 84.  These allegations describe omissions in the Solicitation, not errors in the SOCOM's evaluation method.  Therefore, the court has determined that the *Blue & Gold Fleet* rule applies to those portions of Count I that relate to the RFTOP subfactor.

Under the RFTOP subfactor, the Solicitation required offerors to analyze raw data to "generate conclusions and recommendations regarding the longitudinal stability of the UH-60L [helicopter]."   AR 368–69.   The Solicitation also required that those conclusions and recommendations comply with the Army Standards for Technical Writing, Analysis and Reporting outlined in ATTC 70-2.  AR at 369.  The August 1, 2016 Amended Complaint states that compliance with the Army Standards required knowledge of the techniques used to generate the raw data provided in the Solicitation. Am. Compl. at ¶ 81; *see also Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand*, LLP, 322 F.3d 147, 167 (2d Cir. 2003) ("[T]he allegations in the [operative complaint] are judicial admissions by which [the pleader] was bound throughout the course of the proceeding."); J. Wigmore, *Evidence* § 1064, at 67 (Chadbourn rev. 1972) (explaining that pleadings are judicial admissions).  SDI also admits that the Solicitation "provided no information about the test procedures used to generate the data sets."  Am. Comp. at ¶ 83.

Because information regarding the techniques used to generate the relevant raw data was necessary to comply with the Solicitation's requirement, its omission was obvious.  *See E.L. Hamm & Assocs.*, 379 F.3d at 1339.  Moreover, this omission should have been discovered by an offeror exercising "reasonable and customary care."  *See Per Aarsleff*, 829 F.3d at 1312.  For these reasons, the court has determined that the Solicitation's failure to disclose how the relevant data was generated was a patent error.  SDI does not dispute that it failed to object to the RFTOP subfactor terms, before the close of the bidding process.  Accordingly, SDI waived its right to challenge the Solicitation's failure to disclose the techniques used to generate the RFTOP data sets, as alleged in Count I.  *See Blue & Gold Fleet*, 492 F.3d at 1313.

Therefore, the relevant portions of Count I are dismissed for lack of jurisdiction, pursuant to RCFC 12(b)(1).[10]

---

[10] The Government argues that the court should dismiss Count I of the August 1, 2016 Amended Complaint for failure to state a claim upon which relief may be granted, pursuant to RCFC 12(b)(6).  Gov't Mot. at 14.  But, as stated above, the court considers that the waiver rule articulated by the United States Court of Appeals for the Federal Circuit in *Blue & Gold Fleet* is a jurisdictional requirement that is more appropriately addressed under RCFC 12(b)(1).

ii. **Regarding SDI's Deficiency Under The Recruitment, Retention, And Sustainment Of A Qualified Workforce Subfactor.**

SDI also argues that the SOCOM's evaluation of its compensation plan, under the qualified workforce subfactor, was contrary to applicable law, arbitrary and capricious, and an abuse of discretion, because the SOCOM did not consider associated fringe benefits, as required by the Solicitation. Pl. Mot. at 16; *see also* 48 C.F.R. 15.305(a) ("An agency shall evaluate competitive proposals and then assess their relative qualities solely on the factors and subfactors specified in the solicitation."). The court disagrees.

The Solicitation required offerors to comply with FAR 52.222-46. AR at 365. That regulation states that offerors must "submit a total compensation plan setting forth *salaries and fringe benefits* proposed for the professional employees who will work under the contract," and explains that "[t]he Government will evaluate the plan to assure that it reflects a sound management approach and understanding of the contract requirements." 48 C.F.R. 52.222-46(a) (emphasis added). FAR 52.222-46, however, does not require that an agency weigh salary rates and fringe benefits equally. Nor does it prohibit an agency from considering salary and fringe benefits separately. In fact, the regulation envisions an independent analysis of salary, stating that "salary rates or ranges must take into account differences in skills, the complexity of various disciplines, and professional job difficulty." 48 C.F.R. 52.222-46(b). Therefore, the SOCOM's primary reliance on salary to determine that SDI's compensation plan was deficient, under the qualified workforce subfactor, was consistent with applicable law and the Solicitation.

Contrary to the allegations contained in Count I, the SOCOM considered total compensation. AR at 2782 (graph evaluating incumbent compensation to the offerors' *salary rates and fringe benefits*, and demonstrating that SDI's total compensation was 12.9 percent lower than incumbent levels). SDI is correct, however, that the SOCOM *weighed* salary rates more than fringe benefits, when it determined that SDI's compensation plan was deficient, under the qualified workforce subfactor. AR at 2776. The Initial Evaluation found that SDI's salary rates were 32.1 percent lower than incumbent levels and therefore demonstrated a lack of understanding for the work to be performed. AR at 2776. "The methodology described in [SDI's] proposal . . . used local and regional labor rates as opposed [to] national rates." AR at 2783. But, the skill level and the complex nature of the labor categories described in the Solicitation required offerors to recruit at the national level. AR at 2783. In other words, the salary rates proposed by SDI did not take into account the "complexity" or "professional job difficulty" of the procured services. Therefore, the SOCOM's determination that SDI's compensation plan was deficient, based on these findings, not only is consistent with FAR 52.222-46, but required by that provision. *See* 48 C.F.R. 52.222-46(b) ("[S]alary rates or ranges must take into account differences in skills, the complexity of various disciplines, and professional job difficulty.").

For these reasons, the court has determined that the SOCOM's evaluation of SDI's compensation plan, under the recruitment, retention, and sustainment of a qualified workforce subfactor, as alleged in Count I, was not contrary to applicable law, arbitrary and capricious, or an abuse of discretion. Accordingly, the remaining allegations in Count I are dismissed.

### 2.   The SOCOM's Failure To Specify Its Needs In A Manner Designed To Achieve Full And Open Competition.

#### a.   Count II Of The August 1, 2016 Amended Complaint.

Count II of the August 1, 2016 Amended Complaint alleges that "three of the four deficiencies and [s]ignificant [w]eaknesses it received—[that] formed the primary basis for SDI's removal from the competitive range—were the direct result of the [SOCOM]'s nondisclosure of its labor mix and restrictive staffing profiles." Am. Compl. at ¶ 103.  The Solicitation lists 105 labor categories under the recruitment, retention, and sustainment of a qualified workforce subfactor. Am Compl. at ¶ 105.  But, the SOCOM only evaluated forty percent of those categories. Am. Compl. at ¶ 105.  Although SDI's compensation was higher than CAI's in most categories, CAI's compensation was higher in the categories that the SOCOM evaluated, because, as the incumbent, it knew the SOCOM's labor usage. Am. Compl. at ¶ 105.  Therefore, the SOCOM "skewed the competitive playing field" by "adding labor categories that it had no intention of ordering" and "failing to disclose the labor categories [that] it intended to use." Am. Compl. at ¶ 105–07.

#### b.   The Government's August 29, 2016 Motion To Dismiss.

 The Government contends that "SDI waived its complaints about [the] SOCOM's purported failure to 'specify its needs' and disclose its labor usage in the Solicitations, as well as [the] SOCOM's restrictive staffing profiles." Gov't Resp. at 16.  Count II's allegation that the Solicitation failed to disclose the SOCOM's labor mix, was an obvious error. Gov't Resp. at 17. Indeed, SDI raised the issue twice.  First, SDI submitted a letter to the CO on August 10, 2015, requesting that the SOCOM "[p]lease consider providing a list of the labor categories most frequently requested/needed currently by the Government with the final solicitation." AR at 6. And, on October 29, 2015, SDI submitted a letter to the Ombudsman with the same request.  AR at 255.  SDI, however, failed to object to the Solicitation's nondisclosure of the labor mix or restrictive staffing profiles in a "prescribed formal route[] for protest."  Gov't Resp. at 18. Accordingly, SDI waived its objections regarding labor usage and staffing profiles.  Gov't Resp. at 18.

#### c.   SDI's September 12, 2016 Response To Motion To Dismiss.

SDI responds that the *Blue & Gold Fleet* rule only applies to objections regarding the Solicitation, not challenges to agency evaluations.  Pl. Reply at 2.  Count II, however, does not object to the terms of the Solicitation, but to the "unstated evaluation factors [that] the [SOCOM] employed" during the assessment of SDI's approach to recruitment, retention, and sustainment of a qualified workforce. Pl. Reply at 3.

#### d.   The Government's September 26, 2016 Reply.

The Government replies that the court should "consider[] the true basis of [SDI's] claims and is not bound by [SDI's] characterization" that this protest "is based on alleged errors in agency evaluation." Gov't Reply at 2 (citing *Katz v. Cisneros*, 16 F.3d 1204, 1207 (Fed. Cir. 1994) ("Regardless of the characterization of the case ascribed by [plaintiff] in its complaint, we look to the true nature of the action[.]")).  The allegations in Count II concern information "purportedly

absent from the [S]olicitation[.]"   Gov't Reply at 3.   Therefore, SDI should have made its allegations before the bidding process closed.  Gov't Reply at 3.

### e.   The Court's Resolution.

"A party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims." *Blue & Gold Fleet*, 492 F.3d at 1313.  In determining whether a pleading alleges an objection to the "terms of a Government solicitation," the court looks "to the nature of the action instead of merely relying on the plaintiff's characterization of the case." *Doe v. United States*, 372 F.3d 1308, 1315 (Fed. Cir. 2004).  In this case, Count II alleges that "[t]he Agency's failure to disclose [labor mix] prevented SDI from meaningfully proposing on an equal footing with CAI." Am. Compl. ¶ 106.  This allegation objects to the lack of information provided in the Solicitation, *i.e.* the terms of the Solicitation, not the SOCOM's evaluation of SDI's bid.

"[T]he presence or absence of a patent ambiguity is not determined by the contractor's actual knowledge, but rather by what a reasonable contractor would have perceived in studying the bid packet." *Triax Pac., Inc. v. West*, 130 F.3d 1469, 1475 (Fed. Cir. 1997).  But, the justifications for the *Blue & Gold Fleet* waiver rule "are perhaps [most] compelling where a party had actual knowledge of the ambiguity." *HPI/GSA-3C, LLC v. Perry*, 364 F.3d 1327, 1337 n.9 (Fed. Cir. 2004).  In this case, the Solicitation listed 105 labor categories, but did not disclose the SOCOM's labor mix.  AR at 6, 255.  In other words, the SOCOM did not inform offerors as to the labor categories that it most frequently requested.  AR at 6, 255.  This omission was obvious from the face of the Solicitation.  *See E.L. Hamm & Assocs.*, 379 F.3d at 1339 (holding that a defect is "patent" if it is "an obvious omission, inconsistency or discrepancy of significance").  In fact, SDI identified both the draft Solicitation's and Solicitation's failure to disclose the SOCOM's labor mix.  AR at 6, 255.

Similarly, the Solicitation's error regarding restrictive staffing profiles was obvious.  *See E.L. Hamm & Assocs.*, 379 F.3d at 1339.  SDI had actual knowledge of that error.  After reviewing the draft Solicitation, SDI objected that "the requirements for key personnel [were] restrictive, almost as if the requirements mirror the qualifications of a particular individual." AR at 6.  And, after the SOCOM published the Solicitation, SDI again objected that there were many problems with the staffing profiles, offering, as an example, that the pilot labor category required experience with the MH-60 helicopter, but "only the incumbent contractor and Government personnel have expertise with[that] aircraft." AR at 255.

Despite having actual knowledge of the patent errors alleged in Count II, SDI did not file a formal protest citing these issues prior to the close of the bidding process.  "[M]ere notice of dissatisfaction or objection is insufficient to preserve [a protestor's] [] challenge [to a patent defect in the Solicitation]." *Bannum, Inc. v. United States*, 779 F.3d 1376, 1380 (Fed. Cir. 2015).  Instead, a plaintiff must follow the "prescribed formal routes for protest." *Id.*  Under FAR 33.103(d)(2)(iv), agency-level procurement protests must include a "[r]equest for a ruling by the agency." 48 C.F.R. 33.103(d)(2)(iv).  Neither of SDI's objections to the CO and Ombudsman met that requirement. Moreover, SDI never raised these objections in a bid protest before the GAO or United States Court of Federal Claims until now.  In other words, SDI did not challenge the Solicitation's

nondisclosure of labor mix or restrictive staffing profiles through any of the "prescribed formal route for protest." *See Bannum, Inc.*, 779 F.3d at 1380.

For these reasons, the court has determined that SDI waived the claims alleged in Count II. Therefore, Count II is dismissed for lack of subject-matter jurisdiction, pursuant to RCFC 12(b)(1).

### 3.    The SOCOM's Evaluation Of SDI's Proposal Under The Price Factor.

#### a.    Count IV Of The August 1, 2016 Amended Complaint.

Count IV alleges that the SOCOM's assessment of the SDI's price realism was contrary to FAR 15.404-1(d)(3), requiring that a "proposal['s] [price realism] shall be evaluated using the criteria in the solicitation[.]" 48 C.F.R. 15.404-1(d)(3). The Solicitation required the SOCOM to evaluate price realism, based on the total compensation package proposed by each offeror. Am. Compl. at ¶ 116. Instead, the SOCOM based its price realism evaluation on direct rates, without considering any fringe benefits. Am. Compl. at ¶ 118. "The [SOCOM]'s evaluation contrary to the terms of the Solicitation resulted in a deficiency under the Recruitment, Retention, and Sustainment of a Qualified Workforce subfactor. [But,] [h]ad the Agency performed a proper evaluation, SDI would . . . would have very likely received strengths for its solid compensation package." Am. Compl. at ¶ 120.

#### b.    SDI's August 8, 2016 Motion For Judgment On The Administrative Record.

SDI contends that the SOCOM's evaluation of price realism under the price factor was contrary to law, arbitrary and capricious, and abuse of discretion, because it contained the same errors as the SOCOM's evaluation of its proposed compensation package, under the qualified workforce subfactor. Pl. Mot. at 27.

#### c.    The Government's August 29, 2016 Cross-Motion For Judgment On The Administrative Record, And Response To Plaintiff's Motion For Judgment On The Administrative Record.

The Government responds that the Solicitation did "not describe the methodology required to conduct the price realism analysis." Gov't Resp. at 46. Accordingly, the SOCOM "enjoy[ed] broad discretion in conducting its price realism analysis," including the discretion to weigh salaries more heavily than fringe benefits. Gov't Resp. at 46 (quoting *Ne. Military Sales, Inc. v. United States*, 100 Fed. Cl. 103, 118 (2011)).

#### d.    SDI's September 12, 2016 Reply In Support Of Plaintiff's Motion For Judgment On The Administrative Record.

SDI replies that "[t]he price evaluation was flawed in the same manner as the [SOCOM]'s evaluation of total compensation." Pl. Reply at 14. In other words, the SOCOM based its price realism assessment salary alone, instead of total compensation. Pl. Reply at 15.

**e.      The Government's September 26, 2016 Reply In Support Of Its Motion For Judgment On The Administrative Record.**

The Government replies that SDI fails to dispute that the "nature and extent of a price realism analysis are within SOCOM's discretion." Gov't Reply at 18.

**f.      The Court's Resolution.**

The SOCOM's evaluation of SDI's compensation under the price factor was consistent with applicable law and regulation. In reviewing protests challenging an agency's evaluation of price realism, the court's "focus is whether the agency acted reasonably and in a way consistent with the solicitation's requirements." *DMS All-Star Joint Venture v. United States*, 90 Fed. Cl. 653, 664 (2010). The nature and extent of a price realism analysis, however, "is ultimately within the sound exercise of the agency's discretion, unless the agency commits itself to a particular methodology in a solicitation." *Afghan Am. Army Servs. Corp. v. United States*, 90 Fed. Cl. 341, 358 (2009); *see also Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375–76 (Fed. Cir. 2009) ("The trial court's duty [is] to determine whether the agency's price-realism analysis was consistent with the evaluation criteria set forth in the [Solicitation], not to introduce new requirements outside the scope of the [Solicitation].")

In this case, the Solicitation states that "the Government will conduct a price analysis and price realism of proposals to determine if the proposed price is unrealistically low without valid explanation," but does not require the SOCOM to evaluate price according to any particular methodology. AR at 374. As a matter of law, the SOCOM could therefore structure its evaluation of price realism in any way that was reasonable.

Under the price factor, the SOCOM considered total compensation in its evaluation of the price realism of SDI's proposal. AR at 2782 (graph evaluating incumbent compensation to the offerors' *salary rates and fringe benefits*, and demonstrating that SDI's total compensation was 12.9 percent lower than incumbent levels). But, the SOCOM weighed salary rates more than fringe benefits. AR at 2783 ("Analysis of SDI's pricing data shows an overall 32.1% average employee compensation reduction. The [SOCOM] assessed the offeror's compensation as unrealistically low."). The SOCOM's methodology, and especially its primary reliance on salary as a determinant of price realism, was reasonable, however, because salary was the largest component of the offerors' compensation proposals. AR at 2782.

For these reasons, the court has determined that the SOCOM's determination that SDI's compensation plan was unrealistically low, under the price factor, was consistent with applicable law. *See Ala. Aircraft Indus.*, 586 F.3d at 1375–76; *see also Ceres Evntl. Servs., Inc. v. United States*, 97 Fed. Cl. 277, 303 (2011) ("The nature and extent of an agency's price realism analysis, as well as an assessment of potential risk associated with a proposed price, are matters within the agency's discretion.").

## IV.    CONCLUSION.

For these reasons, SDI's August 8, 2016 Motion For Judgment On The Administrative Record is denied. The Government's August 29, 2016 Motion To Dismiss and Cross-Motion For Judgment On The Administrative Record is granted. Moreover, SDI's June 17, 2016 Motion For

Entry Of A Preliminary Injunction, CAI's August 29, 2016 Cross-Motion For Judgment On The Administrative Record, and SDI's September 7, 2016 Motion To Supplement The Administrative Record are denied as moot.  Accordingly, the Clerk of the Court for the United States Court of Federal Claims is directed to enter judgment on behalf of the Government.

**IT IS SO ORDERED.**

s/ Susan G. Braden
**SUSAN G. BRADEN**
**Judge**